## RALSTON *v.* TURPIN.[1]

*(Circuit Court, S. D. Georgia, W. D.* ———, 1885.)

1. GIFT BY A WEALTHY YOUNG MAN, OF FAST HABITS, TO AN AGENT, UPHELD AS AGAINST HIS WIFE WHO WAS HIS FORMER MISTRESS.

    T. was an intimate friend of R.'s family, and was R.'s guardian. R. had utmost confidence in and friendship for him. When R. became of age, T. settled his accounts as guardian, but R. employed the firm of which T. was a member as his real-estate agents. T. thus had the active management of most of his property. R. made two wills in favor of T.'s children. He afterwards married the complainant, whom he had long known as a prostitute. After the marriage, upon T.'s suggestion whether R. desired to carry out his former purpose, R. made a gift of property, amounting to $40,000, about half of his estate, to T., as trustee of his children, reserving the income for life. Mrs. R. filed her bill, after R.'s death, to set aside the gift, on account of undue influence exercised by T. over R., and of R.'s mental weakness caused by his dissipation. The gift was upheld, and the bill dismissed.

2. MENTAL WEAKNESS ARISING FROM INTOXICATION INVALIDATES CONVEYANCE, WHEN.

    Where there is great weakness of mind in a person executing a voluntary conveyance, arising from age, sickness, intoxication, or any other cause, though not amounting to absolute disqualification, the transaction will be very closely scrutinized, and a court of equity will, upon a proper and seasonable application, set the conveyance aside. But where the evidence relied on to show such

---

[1] Reported by Walter B. Hill, Esq., of the Macon bar.
See notes at end of case.

mental weakness arising from intoxication shows that the grantor had periods of sobriety in which he was able to attend to business, and fails to show that he was intoxicated at the time the conveyance was made, it is not sufficient to avoid the transaction, although it appears that the grantor was a hard drinker, and that habits of intoxication had affected his health and frequently rendered him unfit for business.

3. CONFIDENTIAL RELATIONS—GIFT BY PRINCIPAL TO AGENT.

A gift by a principal to an agent is valid, unless the party who seeks to set it aside can show that some advantage was taken by the agent of the relation in which he stood to the donor. If it appears that the conduct of the agent is fair, honest, and *bona fide*, it is immaterial that the deed of gift may have been drawn up by his solicitor without the intervention of a third party.

In Equity.

*Lanier & Anderson* and *W. Dessau*, for complainant.

*Bacon & Rutherford* and *Hill & Harris*, for defendant.

SPEER, J. The complainant, Ida Ralston, a citizen of the state of New York, prefers her bill against George B. Turpin, as trustee of his children; against William C., Frank M., George B., and Walter H., the children of said George B. Turpin, the *cestuis que trust*, all of whom reside within this jurisdiction. The object of the bill is to have canceled certain deeds of gift made to the respondents by James A. Ralston, who was husband of complainant, to recover the premises conveyed by the deeds, and for the rents, etc. The property involved consists of five business houses, with the lots upon which they are situate, on Cherry street, in the city of Macon, known as the Ralston Hall property. The value is between forty and fifty thousand dollars. James A. Ralston, Jr., died on the fourth day of July, 1883. He had inherited from his parents a very valuable estate, consisting largely of city property in Macon. The bill alleges that James A. Ralston, Jr., had not attained his majority at the time he became the owner of this estate, and that at the September term, 1867, of the Court of Ordinary of Bibb county, the respondent, George B. Turpin, was appointed his guardian, having been selected as such by Ralston. In the month of March, 1870, the mother of James A. Ralston, Jr., Mrs. Aurelia L., who, in the mean time, had married Dr. Nathan Bozeman, made her will, in which she bequeathed to James A. Ralston, Jr., a large estate, and named George B. Turpin as one of the executors. Turpin qualified, and acted in both capacities. The bill charges that Turpin "ingratiated" himself in the confidence of Mrs. Bozeman, and acquired a large influence over young Ralston, who, it is alleged, had little capacity for the affairs of business. Ralston became 21 years of age in 1869; Turpin very soon thereafter made his final settlement as guardian, *i. e.*, on the third day of May, 1869, and delivered to Ralston his entire estate, and took his receipt therefor. Turpin, who was a real estate agent, in partnership with J. Monroe Ogden, continued to manage the estate of young Ralston, which consisted almost entirely of the business houses in Macon.

James A. Ralston, Jr., was an extravagant, dissipated, and dissolute man, and Turpin, it is charged, acquired undue influence with

him owing to their confidential relations, and finally went north, where Ralston was, and induced him to make a deed of gift on the twenty-sixth of August, 1880, and the subsequent deeds in confirmation, which several deeds it is the object of the bill to nullify. One of these deeds is dated August 28, 1880, and the other April, 1881, and conveyed, it is alleged, the more valuable portions of his estate, worth between forty and fifty thousand dollars. Previously to this conveyance, to-wit, in January, 1880, the complainant was married to Ralston, and was, at its date, living with him at Stamford, in the state of Connecticut. She alleges that Turpin came to Stamford, where the first deed was made, and persuaded him to make the deed, and that in consequence of his importunities, Ralston being in declining health and weakened mentally and physically by dissipation, consented to sign the deed which Turpin had prepared and brought with him. The complainant, being herself under the influence of Turpin, and willing to do anything to conciliate and gratify him, as well as indisposed to oppose her husband, consented to unite in the deed and to relinquish her rights in the premises conveyed. The complainant and her husband, Ralston, went with Ogden, the partner of Turpin, who was also in Stamford, to Bridgeport, to find a commissioner of deeds for the state of Georgia, before whom the conveyance could be executed. Finding no such official there, they went thence to New York, where the deed was signed both by Ralston and the complainant herself. A deed to correct a verbal error in the draught of the first deed was also executed in New York, two days thereafter, and in the month of April, in the next year, another deed was forwarded by mail, and was executed by Ralston and complainant, and returned to Georgia. Copies of these deeds are annexed to the bill, and they all convey the same property to Turpin, in trust for his children, the co-respondents, Ralston reserving the incomes during his life.

A good deal is said in the bill about a compromise had subsequently to the execution of these deeds between Ralston, or Turpin acting for him, and Dr. Bozeman, the second husband of his mother, on the one part, and a Mrs. Laura R. Smith, an aunt of Ralston, on the other part, which compromise settled a disputed claim which Mrs. Smith had against the estate of Ralston's father; but, as the court is unable to perceive any relevancy in this matter to the issues presented by the bill and answer, other reference to such compromise will be pretermitted. It is true that this settlement placed an incumbrance on the estate of complainant's husband, and that he paid $2,500 to discharge a portion of the lien which attached to the property he had previously conveyed to Turpin, but this cannot relate back and affect the validity of the deeds on the issues presented by the bill.

It is further charged that Ralston, from mental weakness, was incapable of making a deed; that the deeds were obtained by the undue and controlling influence of Turpin; and that they were wholly with-

out consideration; and the bill prays that the deeds may be canceled, and that the respondents be decreed to account for all the rents, issues, and profits from the date of the execution of the deeds to the date of the decree, and for general relief. Discovery is waived.

The answer of the respondent George B. Turpin, as trustee, outlines the defenses to the bill. Turpin admits his intimate friendship, not only with James A. Ralston, Jr., but with his father, James A. Ralston, Sr., and that he was the confidential friend and business manager of the latter to the date of his death in 1865. He was also the intimate friend of Ralston's mother, and was appointed by her the executor of her will in 1873; that he was appointed the guardian of young Ralston, having been designated as such by the latter in 1867, when Ralston was 19 years of age. He finally, as such guardian, settled with Ralston when he became 21 years of age, and was dismissed by the Court of Ordinary on the third day of May, 1869. He admits and emphasizes the charges of complainant's bill as to the warm and cordial relations of friendship and confidence which existed in the breast of young Ralston towards himself, and insists that they were merited by his own conduct, and by his devotion to Ralston's interests. He avers that Ralston, on account of the unusual and disinterested friendship which existed between himself and the respondent, and the valuable and continuous services rendered by respondent to Ralston and to his family, had voluntarily, and without solicitation, early formed the intention to make large and generous provision for the children of respondent; that Ralston, having no immediate relatives whom he desired to make the recipients of his bounty, had uniformly declared his intention that the respondent's children should, at his death, receive a large portion of his estate. He specially sets out the fact that when Mrs. Aurelia L. Bozeman, the mother of Ralston, came to make her will in 1873, she said to respondent that she had intended to provide for him in her will, but that her son "Jimmie" had informed her that he would provide amply for Turpin in his will, and the fact that in 1874 young Ralston made his will and bequeathed to Turpin, in trust for Mrs. Laura R. Smith, one half of his estate, and to Turpin, for himself and in trust for his children, the other half, which latter half embraced the identical property conveyed by the deeds attacked by the bill; that, in further pursuance of his intention to endow the children of respondent with this property, on the seventeenth of December, 1879, five years thereafter, Ralston made another will in which he conveyed the same property to Turpin's children, omitting from its beneficence, however, one of the daughters of Turpin, who in the mean time had married a Mr. Horne, who was objectionable to Ralston, and devising the remaining half to the complainant, Ida Blanchard, who in a few weeks would become Ida Ralston. The respondent, answering, avers that he was not in any manner consulted by Ralston as to either will, and declares that his daughter, who was not in-

cluded as a beneficiary of the last will, would never have been omitted had Ralston consulted respondent to ascertain and to act upon his wishes. This child was also omitted in the three deeds subsequently executed by Ralston.

The answer admits that Ralston was a young man of intemperate and dissolute habits, but alleges that when not intoxicated, or when drinking with moderation, that he was entirely competent to properly conduct his business affairs, and to intelligently dispose of his property. Respondent, after his guardianship had terminated, was retained by Ralston to collect rents, make rent contracts, and, in a general way, as the real-estate agent, to manage all of his business, which the respondent, with his partner, undertook and carried on to the day of Ralston's death, charging the usual commission therefor. Respondent avers that from disinterested friendship for Ralston, he used all his influence to restrain Ralston from intemperate habits and low and evil associations, with, however, but little success. He avers that Ralston became infatuated with the complainant, who was at the time, and for several years thereafter, a lewd woman, and the regular inmate of a common house of ill-fame in the city of Macon, kept for the purpose of prostitution. Complainant was known as Ida Blanchard. Respondent avers that he used all the persuasive and influential means which could be compassed by him to break the spell of this association. The friends and relatives of Ralston labored to the same end, but the influence of the complainant overcame the efforts of the respondent even when united to that of the relatives and friends of Ralston; that the complainant induced Ralston to go north with her, and finally, in the early part of 1880, to make her his wife. The respondent learned in 1880, while at Saratoga, that there was strong reason to believe that Ralston had married complainant, although he still hoped it was not true. He determined, however, to go to Stamford, in Connecticut, where Ralston and the complainant were keeping house together, to learn the true facts, and to ascertain whether, by this reputed marriage, Ralston had revoked the will heretofore made in behalf of the respondent's children. He accordingly went to Stamford. He saw Ralston and the complainant, and learned from them both that they were in truth legally married. During his visit the respondent, in the presence of the complainant, reminded Ralston that his marriage with complainant had revoked the will of 1879, and asked if Ralston still intended to give the property to his (respondent's) children. Ralston replied unhesitatingly that it was his intention so to do.

The will of 1879, it is claimed by respondent, had been made by Ralston a very short time before the marriage, and it also gave to Ida Blanchard—soon to be Ida Ralston—the half of the property which had been devised in the will of 1874 to Mrs. Laura R. Smith, whose place in the testamentary inclination of Ralston had been usurped by the complainant; but the children of Turpin still maintained this po-

sition in his affection and in his scheme for the disposition of his property. Respondent alleges that Ralston and Mrs. Ralston went with Mr. Ogden to Bridgeport in search of a commissioner before whom the deeds to land in Georgia could be properly executed. Finding none there, they all went to New York, where the two deeds of the 26th and the 28th were formally signed and delivered. The third deed was drawn in Georgia eight months later, and was forwarded to Ralston, who was then in New.York. It was duly executed by Ralston and his wife, and returned to the respondent. Turpin denies that he made any such representations to Ralston as were alleged to have been made at the time the first deed was agreed upon. He denies all the allegations of undue influence, and asseverates that when the first two deeds were executed Ralston was perfectly sober and rational, and that he believes him to have been in the same condition when the last deed was executed. To show his great friendship for Ralston, he alleges that he did not charge or take from him some three thousand dollars as commission on the estate of his mother, of whose will Turpin was the executor. He avers that after all the transactions here described, of which his children were the beneficiaries, Ralston made a deed to the complainant conveying two valuable lots, with the store-houses, in the city of Macon, which property the complainant has since held and enjoyed; and also conveyed to his aunt, Mrs. Smith, other valuable property in Macon under a settlement effected for him. The answer is a stout denial of every material fact alleged in the complainant's bill, and the issues presented are mixed questions of law and fact.

The causes indicated by the complainant, and urged as reasons why the several conveyances from Ralston to Turpin as trustee should be cancelled and nullified, are: *First*, the want of that degree of mental soundness which a man must possess to enable him to bestow his property upon another; and, *secondly*, the undue and paramount influence which Turpin is said to have exercised both upon Ralston and his wife. While much evidence has been presented bearing upon both propositions, the solicitors for either party have seemed to argue with far more elaboration the law and the evidence relating to the allegation of undue and controlling influence.

The rule relating to the question of mental weakness is stated with great precision and clearness by Mr. Justice FIELD in delivering the opinion of the court in the case of *Allore* v. *Jewell*, 94 U. S. 511:

"It may be stated as settled law whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property was grossly inadequate, a court of equity will, upon proper and seasonable application, set the conveyance aside."

*A fortiori* it would seem, as contended in the concluding argument for complainant, a voluntary deed, without other consideration than friendship and intimate personal relations, would be even the more

closely scrutinized where great mental weakness is alleged. It is, of course, incumbent upon the complainant to show by evidence this "great mental weakness" at the time the deeds were executed; that is to say, on the twenty-sixth and twenty-eighth of August, 1880, and the fourteenth of April, 1881, or so nearly thereto as to affect the transactions occurring on such occasions.

The first witness whose evidence was introduced upon this feature of the case was James Olmstead, an attorney at law at Stamford, Connecticut. Mr. Olmstead saw Ralston once only, and in February or March, 1881. He had been drinking heavily, and was in maudlin tears at the time the witness saw him. He promised anything, took an oath to keep the pledge, was loud in praises of his wife and in denunciation of himself. He seemed physically weak, and stated that he had suffered from "*tremens*" several times. The witness concluded that his will power was totally gone. This evidence is clearly not satisfactory, and proves nothing except that Ralston had been drinking heavily and was drunk then. The picture drawn by the witness is unfortunately no unusual spectacle. The lugubrious penitence of a drunken man is so far from serious mental derangement that it has become a part of the stock incident of humorous writers of fiction. A few days' or hours' abstention from drink, with proper medical treatment, would have restored Ralston to the possession of his usual faculties. Undoubtedly, had the deeds been executed at the moment when the witness saw Ralston they would be held invalid; but the condition described by the witness does not necessarily or naturally argue continued great mental weakness.

Sarah H. Hubbard describes, with the indignation of a good woman, Ralston's fits of intoxication, and gives her opinion that he was unable to attend to any business from April, 1880, to April, 1881. This testimony is of little value. Had Ralston been continually in the extreme condition of drunkenness in which she describes him, and as weak physically as she describes him, no medical skill could have kept him alive a month. She testifies that he referred matters of business to his wife, and said, "You know I can't think," as an evidence of his weakness. The court is pretty clear that is rather evidence of the fact that, even when under the influence of liquor, he was sensible enough to know that he had better not act for himself while in that condition.

The testimony of Henry A. Hubbard, the husband of the last witness, is substantially the same. They were neighbors; they both appear to have been offended with Ralston, and speak of him with far too much bitterness to leave the mind under the impression that they regarded him as an imbecile. The last witness testifies that, when not drunk, there were a few times during the year when Ralston was fit for business, and in another connection says: "I would not judge Mr. Ralston to be a capable business man, or fit to do business as men ordinarily do it." No doubt the dissolute conduct of Ralston

was intensely disgusting to these good citizens of the "Land of steady habits." No doubt, in their opinion, he was not only "not a capable business man," and "not worth his salt;" all of which may be true, and yet he may have been legally capable of conveying his estate in an interval of sobriety.

The testimony of L. R. Hurlbut, the physician, who was of course called in when Ralston was at his worst, is unfavorable to the validity of the deeds. It requires no technical knowledge, but simply a common degree of intelligence and experience, to know that a physician, who sees his patient only when in the furious delirium of drink, or the terrible prostration and depression which follow a debauch, is no reliable witness as to his mental condition at other times.

John O. Brintnall's depositions show that he was a neighbor of the Ralston's in Stamford. Saw him frequently drunk. His mind was thick and clouded. When his wife would go off, Ralston would go to Shippan Point and get drunk. On one occasion the witness went to the Windemere in New York, and Ralston came to the door in his night-gown, and said to witness that he and his wife had been on a drunk, and they had a little turn, (the reference to his wife having been erased by the commissioner, counsel for defendant insists that this was improper, and shows that the commissioners were not without bias.) The witness states that he saw Ralston almost every day passing down to his yard. He also states that when Mrs. Ralston went to see the neighbors Ralston would not go, and that when visitors went to the house to see them, Ralston would be out of sight. The witness also testifies that Ralston did not have a prudent and proper conception of the value of property. The opportunities of this witness to know Ralston's business capacity were extremely limited and imperfect. The value of his opinion is to be estimated in the light of the facts upon which it is based. He specifies but three instances in which he had a conversation with Ralston, and on each occasion the latter was drunk. "I *think*," he says, "I know his mind had been impaired by the use of liquor." None of these witnesses knew Ralston before he went to Stamford. It is deemed admissible for a witness upon such facts as these, and with an opportunity to know the actual truth as meagre as this, to give his opinion; but the opinion itself is of little moment.

Margaret O'Brien, known as "Sister Margaret," one of those holy and unselfish women who devote their lives to the alleviation of human misery and the betterment of human nature, is the next witness for complainant. The good sister knew Ralston at the St. Elizabeth's hospital in New York. Both Ralston and his wife were there sick. She saw him in Montclair, two weeks before he died, in 1883. She saw him frequently throughout this period. She testified: "I would call Mr. Ralston an habitual drunkard. He spent his money very freely. He was not prudent or careful, but was very extravagant. I can't testify whether he had a proper conception of the value of property.

I don't think he was very easily influenced. In 1880, 1881, and 1882 his mind appeared to be all right. It had not been impaired, so far as I know. He was very seldom sober during that time. In the hospital he was allowed from three to five milk punches a day, and he would try to steal out for more. The effect was to make him stupid and helpless after going out." Further on, Sister Margaret testifies: "I do not think he was capable of business in 1880, 1881, and 1882, because of his drunkenness." And, after a moment's reflection, the excellent sister says: "I do not know whether he was capable or not." The court attaches very great importance to the evidence furnished in the depositions of this witness. Her truthfulness is apparent in every utterance. She saw Ralston frequently; she watched him closely; his mind was "all right" in 1880, 1881, and 1882, except when he was drunk. Then he was "incapable," she thinks, but does not know. She has none of the characteristics of the swift witness. Her *amour propre* had not been offended by the purse-proud insolence of Ralston as had been the Hubbards. Accustomed to view the suffering and the afflicted, her judgment is not startled from its propriety by the spectacle of drunkenness or prostration. Unlike the physician, her observation is not confined to that moment of frenzy when the solicitude of friends has prompted the cry, "Run for the doctor." She is the patient, watchful, even-tempered, and unruffled nurse; and, moreover, her veracity is unquestioned. Besides, her testimony is entirely consistent with the observation of practical men in cases like that of Ralston. It is lamentably true that, in spite of the efforts of the good and the pious, this observation may be had in almost every community; and the court repeats that it does not require the science taught in the schools of medicine to discover that the simple outline of this unfortunate character drawn by the sister is accurate and true in the light of practical intelligence.

It is true that two expert medical men, Dr. W. Gill Wiley and Dr. William R. Pryor, testify that in their opinion Ralston's mind, in 1880, 1881, and 1882, was not competent to the discharge of business functions. Dr. Wiley testifies that at times during this period his mind might have been clear. Dr. Wiley, in his own language, always saw Ralston when he "needed the doctor." He testifies that Ralston used intoxicating liquors almost habitually, at times excessively, and a greater part of the time "I should say," testifies the doctor, "that he did not have a proper conception of the value of property." While stating that his mind was impaired by the use of liquor, Dr. Wiley qualifies his statement, "But I saw him when he needed a doctor." An important statement of this witness discloses the character of Ralston's fits of drunkenness. "When he started to drink," said the witness, "he drank until he broke down, and this weakened him both physically and mentally." The testimony of this witness is to the effect that Ralston was incapable of managing a general business continuously, and this is all. Dr. Pryor saw Ralston when he was suffer-

ing with acute alcoholism. This the court understands to be *delirium tremens.* He saw him afterwards when suffering with acute pleurisy from alcoholism: the first time, December 19, 1882; the second, December 22, 1882,—20 months after the last deed was executed and shortly before his death. He did not know Ralston in 1880 and 1881. This testimony is of little value.

The testimony of Howard E. Jones, who knew Ralston in 1880 and 1881 in New York, does not materially differ from the evidence of the other witnesses for complainant who are not experts, except that he states that Ralston was sober half the time; the rest, he was under the influence of liquor.

The depositions of Ida Ralston, it is true, present a terrible account of her husband's drunkenness. Her evidence will be more fully considered in another connection. It is perhaps sufficient at this time to say that she speaks of several intervals of sobriety during their married life. This began on the third of January, 1880. For three months Ralston was sober. After signing the deed of 1881 he kept the pledge not quite two weeks. He must have been sober at the time he signed the deeds, or her testimony would have indicated otherwise. His signatures are clear, steady; betraying none of that tremulous quiver which characterizes the handwriting of the inebriate who is suffering from the effects of a debauch. The complainant herself, long after the execution of the deeds in controversy, received from Ralston a deed to two valuable stores in Macon. She thinks him competent to execute these deeds because, she says, "they had a valid consideration." After the execution of these deeds to her, as late as November 27, 1882, she takes from Ralston a written promise to consent to a "bill of separation" if he does not abstain from drink. This paper is executed with great formality. Its interlineations are marked with the initials of Ralston, and it is signed by him with an easy and graceful sweep of the pen, which indicates no diminution of nervous control.

The court has confined its attention to the evidence for the complainant. This is scarcely fair to the defendant, and yet, in the opinion of the court, it is unmistakably clear that no evidence is afforded sufficiently satisfactory of such great mental weakness as will vitiate these deeds. It is not to be denied that Ralston was generally a drunkard. It is perhaps equally clear that he could not have successfully managed any business which required his continuous or even daily attention; but it is not clear that he may not, when sober, intelligently have conceived, and lawfully have carried out, a scheme for the distribution of his property. Many men of large and successful business capacity are heavy drinkers. Many intellectual men of great power indulge in periodical sprees, and pour the various dilutions of alcohol into their stomachs, until the brain, if distilled, would produce alcohol, and the stomach, revolting at the caustic poison which has seared its membranes and paralyzed its healthy functions, not only

rejects all nourishment, but violently ejects the stimulant which the poor sufferer craves, but cannot retain. Then, weakened by the want of food and suddenly deprived of the alcohol, which has become at once its substitute and the anodyne for his humiliation and shame, he is the most pitiable and wretched of the unfortunate, and it would seem that not "poppy, or mandragora, or all the drowsy syrups of the world," could lull the sleepless nerves, and give rest to the tremulous and miserable body. And yet a few days' abstinence, with simple and well-known treatment, will completely restore the sufferer to health. Ralston was a "periodical drinker," and there is nothing in all the evidence which indicates, in his periods of sobriety, imbecility or great mental weakness. So far as the evidence of the complainant goes, his capacity to convey his property in his sober and lucid moments was as unquestioned as that of hundreds of men whose capacity in this respect would be conceded by entire communities.

The evidence offered by the respondent that Ralston was rational, sober, and intelligent on the particular occasions when the deeds were signed, is not even controverted. Mr. Proudfit, a witness to the deed of August 28, 1880, testifies that he was sober and perfectly rational. W. H. Ross saw Ralston about that time. He was rational and sober; both of these witnesses are citizens of Macon, who knew Ralston well. J. E. Jones, the president of the Southwestern Railroad Company, testifies that when he was sober he had capacity and was "a smart fellow." Other witnesses corroborate this testimony. Besides this, the correspondence put in evidence not only shows that Ralston was exercising a reasonably diligent and watchful degree of attention to his business, but on several occasions he speaks of his excellent health. This evidence is more reliable than the testimony of witnesses. Why should Ralston, on July 28, 1880, write that he was enjoying good health if he was the miserable wreck the complainant would have the court to believe? Why, on the day before the last deed was executed, i. e., on the eighteenth of April, 1881, should he write, "My health is splendid?" This evidence, free from afterthought, without discoverable impropriety of motive contemporaneous with the main incident, is of very great value. In generally bad health, Ralston, like many other invalids, esteemed his physical condition of prime interest to his correspondent, and the letter written at the time must be regarded as the truth. In the presence of all this evidence to show Ralston in the possession of a sufficient degree of intelligence to convey his property, and in the absence of definite and satisfactory evidence to the contrary, the court is clearly of the opinion that there can be no doubt, so far as this allegation of incapacity is concerned, the deeds are valid, and the prayers of the bill must be denied.

It is urged with great ability and force of statement and reasoning that the relation existing between Ralston and the defendant was of a confidential character; that the actual relation of guardian and

ward, while it was nominally at an end, in fact had not te 'minated; that Turpin's influence over Ralston was unbounded and controlling, equivalent to that of a father over a son; that the deeds were not voluntary, but were suggested and were obtained by undue and improper influence by Turpin; and that under these circumstances a court of equity will not permit the deeds to stand. An abundant wealth of legal learning relating to the question involved has been gathered by the research and diligence of the solicitors, and is presented for the assistance of the court. From these authorities we have ample warrant for the opinion that the powers of a court of equity are not only ample to set aside a conveyance obtained by undue influence, but that, based upon the broad principles of an elevated morality, this is a conspicuous and prominent feature of equity jurisdiction; and where a fiduciary relation exists, a court of equity will hold that a conveyance to the party who exercises the dominant power by the person dominated is invalid. 1 Pom. Eq. 492, 493. The statement of the principle is clear and ample, and is adopted by the court as expressing the rule in this case:

"The equitable rules concerning dealings between guardian and ward are very stringent. The relation is so intimate, the dependence so complete, the influence so great, that any transactions between the two parties, or by the guardian alone, through which the guardian obtains a benefit, entered into while the relation exists, are in the highest degree suspicious; the presumption against them is so strong that it is hardly possible for them to be sustained. Indeed, many authorities lay down the positive rule that the parties are wholly incapacitated from contracting, and that any such transaction between them is necessarily voidable. This statement is perhaps too broad. A will by the ward in his guardian's favor is not viewed so strictly; the presumption against it may be overcome and the will sustained. The general doctrine of equity applies to the parties after the legal condition of guardianship has ended, and as long as the dependence on one side and influence on the other, presumptively or in fact, continue. This influence is presumed to last while the guardian's functions are to any extent still performed, while the property is still at all under his control, and until the accounts have been finally settled. It follows, therefore, that any conveyance, purchase, sale, contract, and especially gift, by which the guardian derives a benefit, made after the termination of the legal relation, but while the influence lasts, is presumed to be invalid and voidable. The burden rests heavily upon the guardian to prove all the circumstances of knowledge, free consent, good faith, absence of influence, which alone can overcome the presumption. If the legal relation has ended, and all these circumstances of good faith, full knowledge, and free consent are clearly shown, a settlement, conveyance, contract, or even gift from the former ward to his recent guardian will be as valid and as effective as the same transaction between any other competent persons."

It is contended further by the complainant's solicitors that the relation of principal and agent is also within the range of the presumption stated, and they cite Code Ga. § 3177; Kerr, Fraud & M. 172; 2 Pom. Eq. § 951; 1 Story, Eq. 315; *Hunter* v. *Atkins*, 10 Eng. Ch. 113; *McCormick* v. *Malin*, 5 Blackf. 509; *Harris* v. *Tremenheere*, 15 Ves. Jr. 34, and notes.

An examination of these authorities will show that they relate to bargains between the agent and the principal. Here the act complained of is a gift. Now, it has been repeatedly held, and it is declared settled by the text writers, that a gift by a man to a person who has been for many years acting as his confidential agent and adviser is valid, unless the party who seeks to set it aside can show that some advantage was taken by the agent of the relation in which he stood to the donor. If it appears that the conduct of the agent was fair, honest, and *bona fide*, it is immaterial that the deed of gift may have been drawn up by his solicitor without the intervention of a disinterested third party. Kerr, Fraud & M. 176, and authorities cited. In the case either of guardian or ward, where the relationship has completely ended, or principal and agent, or, indeed, in any other confidential relation, if it can be shown by satisfactory extrinsic evidence that confidence has been abused and influence unduly exerted to obtain a gift, the rules of equity, and the remedies which it bestows, are exactly the same as where the presumption is created. In the case now under consideration the guardianship had been terminated 11 years. It was not a bargain between the agent and the principal, but a gift. No presumption exists against this gift. Does the extrinsic evidence satisfactorily prove the allegations of confidence abused and dominant influence misused? To clearly and properly answer this question, we must consider the parties and their mutual relations.

Ralston was a young man without aim or ambition in life except that he be permitted to live, and have the means to live, as he desired. A more aimless existence could not be conceived. He was a man of fortune; he had no immediate relatives except five aunts and their children; father, mother, and brothers were all dead. He early considered what should be done with his property when he died. In 1873, many years before he met the complainant, he had said to his mother: "I purpose to give a portion of my property to the children of my friend Turpin." In 1874 he made his will. That he was at that time rational, intelligent, and sober, no one has questioned; and the attorney who drew the will, a distinguished gentleman of elevated character, has testified that he was perfectly sober, and gave all of the directions for the will with clearness and with careful and explicit attention to the details. In this will he gave to his aunt, Mrs. Smith, a portion of his real estate, and a large portion to Turpin and to his children. In this will he makes provision for the stone to mark his grave, and, with singular omission of reference to any of his own blood, although they, too, are to receive his bounty, he writes: "I request that my friend George B. Turpin, and his children after him, will see to it that my monument and grave, always during their lives, shall be suitably kept and cared for." It must have been a close and warm friendship and mutual esteem which would so early dictate so large a bequest and attach to it so delicate a condition.

To care for and preserve the resting-place of the dead, from the earliest antiquity, has been the province of the friend who "sticketh closer than a brother."

At the time the will of 1874 was made, Ralston had never met the complainant. He made no secret of his intention to make Turpin's children the legatees of his will. Many witnesses have been examined who gave evidence that this intention was uniform and generally known. When Ralston met Ida Blanchard, or Sally Harden, as he calls her in the will presently to be mentioned, does not appear. But he married her on the third day of January, 1880, after living with her as his mistress for several years. On the fifteenth of December, 1879, he made another will. His mistress had become sufficiently dear to him to drive from his memory his duty to his aunt and cousins, whom he had provided for in the will of 1874; but her influence, although amounting to an infatuation which had driven him from his home, made him the finger-point of scorn for the manhood, and of contempt and aversion for the womanhood, of the city where he was born and reared, had not proven strong enough to efface his determination to provide for the children of his friend, who was the friend of his father and of his mother, both now dead. The directions for this will were given with equal explicitness as with the first will. He was well and sober. Turpin was in Georgia; the will was executed in New York, and he bequeaths the identical property to Turpin, as trustee for his children, which he conveyed by the subsequent deeds when Turpin informed him the will had been revoked by his marriage with the complainant. This will, with this provision for the children of Turpin, was signed but 18 days before the marriage. Ralston had kept the will by him for several months. At this time Ralston must have been completely under the spell of the complainant's influence. It is unreasonable to say that Turpin influenced this will. The will of 1874 was still in existence, and that will gave to Turpin's children a larger share than the will of 1879, and to Turpin himself a share of the bequest. What motive could Turpin have to promote a will which would diminish his children's expectancy and destroy his own? It is impossible that this will should be regarded otherwise than as the evidence of a settled purpose on Ralston's part to provide for Turpin's children, and to also provide for the woman who was soon to bear his name. That the marriage revoked this will is clear, but it does not appear that Ralston knew this until Turpin informed him of it the ensuing August, when at once he makes a deed which carries out the provisions of the will. Two days thereafter he makes another, and eight months after this, and after eight months' absence from Turpin, he makes another and a third deed to effect the same design. What more conclusive evidence of a fixed and settled purpose can be presented? It also appears that he effects his testamentary purpose for the benefit of Ida Ralston, as indicated by the will of 1879, by a deed in her behalf,

and afterwards by a will in which he makes no mention of Turpin's children, having provided for them.

It is true that Turpin's influence with Ralston seems to have been great, and, so far as it appears from the evidence, this was natural and to be expected. The complainant's solicitors admit in argument that Turpin's accounts were scrupulously correct. When he, as guardian, turned over to Ralston his estate, in addition he handed to him $13,000 in money and notes, which in a short time had been the fruit of Turpin's judicious management. Ralston had been taught by his parents to confide in Turpin and to trust him. The fact that the deeds to Turpin's children were drawn by a lawyer at Turpin's instance does not seem to have the importance given it by complainant. "If the conduct of the agent appears fair, honest, and *bona fide*, it is immaterial that the deed of gift may have been drawn up by his solicitors without the intervention of a disinterested third party." Kerr, Fraud & M. 176. See note 4 for authorities cited. It is said that Turpin solicited Ralston to make the deed. It seems that this solicitation simply reminded him that his marriage had revoked a will made but 18 days before that event, which will provided for the marriage, and also for Turpin's children, and it seems to make inquiry whether he had changed the consistent purpose of his life to that time. The suggestion was frankly made to Ralston and his wife. It is true that Turpin had prepared the deed, and had it with him. Ralston and his wife promptly consented to sign the deed. It is idle to claim that Turpin had any dominating influence over the complainant. The solicitude which counsel attribute to a fear on her part that her reputation would be impaired by Turpin's disclosures is hardly credible in the case of a woman of her antecedent experiences, and she would hardly value temporary good fame in the small town of Stamford as equivalent to a block of city property in the heart of Macon. Besides, there is not a syllable of evidence that Turpin threatened to reveal her past life, but from her own lips we learn he treated her with respect and kindness. A court of equity cannot indulge conjectures of this vague and intangible sort. It is equally unjustifiable to urge that Ralston did not know the value of the property; and, whether it was of greater or less value than the Third street property, it is clear from all the evidence that the property conveyed by the deeds had been intended for Turpin's children, at the latest, since 1874.

The transaction is said by the complainant to be unnatural,—*First*, because Ralston in the deeds omitted to recall the fact that he had five living aunts and an abundant supply of cousins. It was even more unnatural, they say, because he did not wait to ascertain if there would be children by his wife, the complainant. It seems, however, that his aunts had theretofore made little impression upon his testamentary purposes, except Mrs. Smith, whose place in the will of 1874 was supplied by Ida Blanchard, otherwise Sallie Hardin, in the will of

1879. With regard to the other suggestion, there seems to have been little novelty or change in the relations between the complainant and Ralston consequent upon the form of marriage had in January, 1880. It is very evident that this form, for several years past, had been regarded by both parties as superfluous. Ralston knew that no children would follow this unholy union. Nor is it unnatural that he should decline to bestow all of his ample fortune upon a wife whose character had degraded him and destroyed every hope of reformation and every anticipation that he might regain that position in life to which by birth and fortune he was entitled. He provided amply for her comfort. But, in the opinion of the court, it would have been far more unnatural and shocking to the moral sense had he forgotten the friend of his childhood, his guardian and his trusted friend, and the children of that friend, to whose affectionate memory he had committed his tomb, and for whom he had promised his mother to provide, in order to bestow his magnificent patrimony upon a woman whom he made his wife, but whom he had found a harlot in a brothel.

That Turpin had influence with Ralston is not to be disputed, but there is no evidence that the influence has been abused. That Ralston trusted him is unquestionable, but there is in the record before us no betrayal of that trust. If there is evidence of undue influence upon Ralston, that influence was exerted by the complainant. Her influence with him was imperious. After four years of illicit life with him she marries him. Had he desired the marriage, it would have been solemnized at an earlier day. She knew that to marry him was to ruin him. She knew that from that moment he was a social leper. She knew that no decent man would take her husband to his home; that no pure woman would touch the hand that had been joined in wedlock with hers,—and yet she married him, and no protest of friend or family could swerve her from her purpose. Her motive must have been sordid in the extreme. Had she been a pure woman who had surrendered her person to her lover, and then sought wedlock as the means of redress for her wrong, this court would applaud and approve her motive. But when she met Ralston it was as a public prostitute. But she married him, and now she sets up, in avoidance of the bounty to the children of his friend, habits of intemperance which were encouraged and fostered in the orgies of the bawdy-houses where he found her.

Other arguments, some of them of great force, (as, for instance, the fact that eight months after the execution of the first two deeds, which the complainant attacks, she formally joined in the execution of the third deed, and thus is estopped,) have been advanced for the defendants. The court, however, prefers to place its decision on the broad grounds—*First*, not only does the complainant fail to show such weakness of mind on the part of Ralston as will invalidate the deeds, but the evidence demonstrates that at the time they were made he was abundantly capable to dispose of his property as he might think

proper; *second,* so far from indicating an abuse of influence or a betrayal of trust, the evidence amply shows that this disposition of the particular property had been the long-settled and cherished purpose of Ralston's life, and it must stand as he intended. The court directs that the prayers of the bill be refused, and that the complainant pay the costs.

NOTE.

*Confidential Relations.*

1. A DISTINCTION BETWEEN TWO CLASSES. The object of this note is to establish a distinction between two groups of those relations which, in equity, are termed "confidential." The text writers treat them as belonging to the same class. The adjudged cases support the discrimination here maintained, but do not set it forth in terms. A division of "confidential relations" into the two classes will probably promote distinctness of thought in the consideration of the subject. The first group comprises those relations which imply control or dominion by one person over the will of another, such as guardian and ward, trustee and beneficiary; in which cases dealings between the parties are subject to an adverse presumption, because of the opportunities and temptations which these relationships afford for the improper exercise of the dominion thus acquired. The second group comprises relations of trust or confidence, such as principal and agent, and partners; in which cases dealings between the parties are closely scrutinized, because of the opportunities and temptations which these relationships afford for the abuse of trust and confidence. It is true that in the former group confidence as well as control may, and generally does, exist; but in the latter case confidence alone exists, while dominion is not implied. It could not be said that an agent, who is the mere creature of the principal, who cannot be appointed except by a person *sui juris,* and whose appointment is revocable by the principal at discretion, (fairly exercised,) has the same opportunity to dominate his principal as the guardian, whose relation is conferred by a will other than the ward's, who stands *in loco parentis* to a person under a disability, and whose appointment is for a term fixed by the law. Dominion is the characteristic feature of the latter relationship; trust, of the former.

2. THE FIRST GROUP—RELATIONS OF DOMINION. The application of the rules governing these relations was made at an early day to those which may be called the technical fiduciary relations,—guardian and ward, trustee and *cestui que trust;* also to the relationship of solicitor and client. The leading case on this subject (so treated by White & Tudor) is that of Huguenin v. Baseley, 14 Ves. Jr. 273, a case celebrated alike for the elaborate and able judgment of Lord Eldon and the masterly argument of Sir Samuel Romilly. In that case a voluntary settlement by a widow upon the defendant, a clergyman, and his family, was set aside as obtained by undue influence and abused confidence in the defendant as an agent undertaking the management of her affairs. The contention of Sir Samuel in the case, to which he brought all the powers of his mind, was that the principle which governed the relation of guardian and ward ought, upon principles of "public policy and utility," to be extended to all cases coming within the reason and spirit of the rule applicable to that relation; and as the case was one of influence and dominion acquired by "spiritual ascendancy," it should turn upon the same doctrine. It reduces somewhat our admiration for the research, though not for the ability, of the celebrated solicitor who argued the case, and of the chancellor who decided it, to discover that many years before, Lord Northington, (Norton v. Relly, 2 Eden, 286,) "the father of equity," had decided the precise point for which Sir Samuel so strenuously contended, and which Lord Eldon sustained. The case was not cited. It holds that spiritual ascendency is within the scope of the principle. The ascendency acquired by a "medium" is a later illustration of the rule. Thompson v. Hawks, 14 Fed. Rep. 902. In the extension of the principle "to all the variety of relations in which dominion may be exercised by one person over another," (Lord Cottenham in Dent v. Bennett, 4 Mylne & C. 277,) it has been held to embrace the relation of parent and child, when the child has just attained majority; child and parent, when the latter is, by reason of old age or other cause, subject to the will of the former; to all similar cases, such as uncle and niece, etc.; although one court has held that there is no presumption of this dominion in the relation of a son-in-law to a mother-in-law; also to physician and patient, Pratt v. Barker, 1 Sim. 1; to the case of mistress and paramour, Bivins v. Jarnigan, 3 Baxt. 282; Turner v. Turner, 44 Mo. 535, etc.

3. THE SECOND GROUP—RELATIONS OF TRUST. In the second group, perhaps, the leading case is that of Hunter v. Atkins, 3 Mylne & K. 134, in which Lord Brougham delivered a decision which has met with as much approval as that of Lord Eldon, already mentioned. The gift was by a client to his solicitor, and after holding that the act was

the "pure, voluntary, well-understood act of the donor's mind," Lord BROUGHAM says: "No law that is tolerable among civilized men—men who have the benefits of civility without the evils of excessive refinement and overdone subtlety—can ever forbid such a transaction, provided the client be of mature age and sound mind, and there be nothing to show that deception was practiced, or that the attorney or solicitor availed himself of his situation to withhold any knowledge, or to exercise any influence hurtful to others and advantageous to himself." Lord ELDON himself, in Harris v. Tremenheere, 15 Ves. Jr. 34, recognizes the distinction between the two relations by applying a different rule to the case of a mere agent from that he had laid down in the case of Huguenin v. Baseley, 14 Ves. 273. The leading American case on this branch of the subject is that of Uhlich v. Muhlke, 61 Ill. 499, in which a very large gift, made by a principal advanced in years to an agent, was upheld, under somewhat extraordinary circumstances, because upon review of all the facts it appeared that the conduct of the agent had been honest, and that he had not abused the confidence reposed in him. The most frequent application of the doctrine of confidential relations to the law of principal and agent is in those cases where an agent to buy sells from himself, or an agent to sell is himself the purchaser. In such case the transaction may be set aside at the instance of the principal upon the ground of fraud in the abuse of trust. The difference between cases of sales and gifts by agents to principals will appear by comparing Harris v. Tremenheere and Uhlich v. Muhlke, *supra*, with McCormick v. Malin, 5 Blackf. 509. The principle that in dealings with each other partners are held to the utmost good faith, and that equity will set aside any undue advantage obtained by one over another, also rests upon the same ground of confidence, and not of any presumption of dominion. The mere fact that the donor had very great confidence in the donee raises no adverse presumption. The question is, was the conduct of the party receiving the gratuity honest, and was the gift the voluntary act of the donor? Toker v. Toker, 31 Beav. 629; Pratt v. Barker, 1 Sim. 1; S. C. 4 Russ. 509; Pressly v. Keamp, 42 Amer. Rep. 635.

4. DISTINCTIVE FEATURES OF THE TWO GROUPS. The following distinctions have been established by the decisions between the two groups of confidential relations. These distinctions could not be justified except for the broad discrimination which differentiates the two classes. *First.* In the case of a gift by a person sustaining any relation in which dominion is implied, there is a presumption of law against its validity. In case of gift by principal to an agent the *onus* is on the party assailing it. Smith v. Kay, 7 H. L. Cas. 751, 759. *Second.* In case of confidential relations within the first group, the law prohibits a gift during their continuance, and until such a time afterwards that the person subject to the dominion is presumed to be "emancipated" from it. The law permits a gift by an agent to his principal during the continuance of the relation. Hunter v. Atkins, Uhlich v. Muhlke, *supra*. *Third.* In cases falling within the first group, the courts attach very great importance to the fact whether the donee had independent advice. In case of gift by agent to his principal this is declared to be immaterial. Principal case, and authorities cited. The material inquiry, therefore, in scanning a transaction between a principal and agent, is simply this: Has the agent, who, by means of his knowledge of the principal's business, acquired an intimate acquaintance with his affairs, and who possesses the confidence of his principal, made use of that knowledge to mislead and defraud his principal, and to abuse and betray the confidence which has been reposed in him. The material inquiry in cases in the first group is: Has undue advantage been taken of the supremacy growing out of the relation,—has undue influence been exercised?

*Macon, Ga.*                                                                 WALTER B. HILL.

### NOTE.

#### *Gift of Real Estate.*

1. CONFIDENTIAL OR FIDUCIARY RELATIONS. Transactions between persons sustaining relations of trust and confidence, particularly where the stronger and controlling mind has obtained an advantage, are regarded with suspicion. Sprague v. Hall, 17 N. W. Rep. 743. See, also, O'Dell v. Burnham, 21 N. W. Rep. 635.

2. DRUNKENNESS. It cannot be said that because a man is an habitual drunkard that he is consequently of unsound mind. Estate of Lang, 2 Pac Rep. 491.

3. FRAUD. Must be pleaded and proven prejudicial, Missouri Valley Land Co. v. Bushnell, 8 N. W. Rep. 389, and the pleadings must state facts which show conduct complained of to be fraudulent. Lafayette Co. v. Neely, 21 Fed. Rep. 738. Fraud is a question of fact, to be determined from all the circumstances in the case. Knowlton v. Mish, 17 Fed. Rep. 198. Must be clearly established, Fick v. Mulholland, 4 N. W. Rep. 527; Campau v. Lafferty, 15 N. W. Rep. 40; Lavassar v. Washburne, 6 N. W. Rep. 516; but does not have to be proven beyond a reasonable doubt. Wood v. Porter, 9 N. W Rep. 113. Must be proven as alleged. Fairburn v. Goldsmith, 12 N. W. Rep. 273. May be shown by parol, to impeach written instrument. Day v. Lown, 1 N. W. Rep. 780; Tufts v. Tufts, 3 Pac. Rep. 390. Burden of proof is on him who alleges. Eckert v. Picke., 13 N. W. Rep. 708. When shifts to defendant, and he required to show fair-

ness of transaction. Smith v. Smith, 19 N. W. Rep. 47. What amounts to. Wooley v. Drew, 13 N. W. Rep. 594. Misrepresentation as to the legal effect of an instrument whose contents are known, not. Jagger v. Winslow, 15 N W. Rep. 242.

4. INSANE DELUSION. What amounts to. In re Stewart, 22 N. W. Rep. 392. Delusions and whims of testator do not destroy his testamentary capacity, if he has the ability to make a sensible disposition of his property. Rice v. Rice, 19 N. W. Rep. 132. Delusion in testator as to "greenbacks," or to the effect that one is holding or running for an office, or that his wife courted him or had mistreated him after marriage, do not render testator incompetent to make a will, if they do not influence its provisions. Rice v. Rice, 15 N. W. Rep. 515. Will set aside for undue "spiritual" influence, when. Thompson v. Hawks, 14 Fed. Rep. 902. Religious, insane delusions, which take possession of the person, dominate his life, and enter into the disposition made of his property, will destroy the will. Id., and note on page 906. Insane delusions defeat a will, when. In re Will of Cole, 5 N. W. Rep. 346. Disinheriting a favorite child is not evidence of. Bomgardner v. Andrews, 8 N. W. Rep. 481.

5. MENTAL WEAKNESS AND UNSOUNDNESS OF MIND. Mere mental weakness, where there is power to contract at all, is not sufficient ground to warrant setting aside a deed of gift or sale, where no fraud or undue influence is shown, Campbell v. Campbell, 2 N. W. Rep. 541; Abbott v. Creal, 9 N. W. Rep. 115; or for refusing to admit will to probate. Fraser v. Jennison. 3 N. W. Rep. 882. As to amount of mental capacity necessary to make a will, see Blakely v. American Bible Soc. 4 N. W. Rep. 337; Webber v. Sullivan, 12 N. W. Rep. 319, In re Stewart, 22 N. W. Rep. 392. Effect of business incapacity, inability to learn to read beyond the alphabet, or to count more than 20, and a preference for large coins over small ones, regardless of value, considered. Shoulters v. Allen, 16 N. W. Rep. 888. Conveyance by an enfeebled old man in consideration of support set aside on ground of. Raynett v. Balus, 20 N. W. Rep. 533. Deed executed while one is *non compos mentis* will be canceled. Fisher v. Fisher, 11 N. W. Rep. 861. Deed of insane man set aside, when. Rogers v. Blackwell, 13 N. W. Rep. 512. Burden of proof on party alleging. Stephenson v. Stephenson, 17 N. W. Rep. 456. What evidence admissible to show. Wurzell v. Beckman, 18 N. W. Rep. 226.

6. UNDUE INFLUENCE. What amounts to. Watkins v. Brant, 1 N W. Rep. 82; Hanna v. Wilcox, 5 N. W. Rep. 717; Ashton v. Thompson, 9 N. W. Rep. 876; O'Neil v O'Neil, 14 N. W. Rep. 59; Webber v. Sullivan, 12 N. W. Rep. 319. Must be equivalent to moral coercion. In re Will of Carroll, 7 N.W Rep. 434. The allegation that a conveyance of real estate and personal property was obtained by undue influence of the grantee upon the mind of the grantor must be established by evidence, or it will not be considered. Ireland v. Geraghty, 15 Fed. Rep. 35. Respecting the sufficiency of the evidence, see Porter v. Throop, 11 N. W. Rep. 171; Shepardson v. Potter, 18 N. W. Rep. 575. As to presumptions of undue influence, see Thompson v Hawks, 14 Fed. Rep. 902, and note on page 905. When presumed in transactions between parents and children. Bowe v. Bowe, 3 N. W. Rep. 813; Ashton v. Thompson, 18 N. W. Rep. 918; Smith v. Smith, 19 N. W. Rep. 47. Inducing old and imbecile person to do what is just and for his own good is not, although advantage result therefrom. Dailey v. Kastell, 14 N. W. Rep. 635. The burden of proof is on party alleging, Webber v. Sullivan, 12 N. W. Rep. 319, and may be shown by circumstantial evidence, and relations of parties. Shepardson v. Potter, 18 N. W. Rep. 575. What evidence admissible to show. Dye v. Young, 7 N. W. Rep. 678; Shepardson v. Potter, 18 N. W. Rep. 575. Prior statements of testator, when admissible. Storer v. Zimmerman, 8 N. W. Rep. 827. When testator shown to be of unsound mind, cannot be considered. Estate of Lang, 2 Pac. Rep. 491.                                                 JAS. M. KERR.