*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 12a0408p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

CRYSTAL DIXON,

                *Plaintiff-Appellant*,

    *v.*

UNIVERSITY OF TOLEDO,

                *Defendant*,

LLOYD JACOBS, individually and in his official capacity as President, University of Toledo; WILLIAM LOGIE, individually and in his official capacity as Vice President for Human Resources and Campus Safety, University of Toledo,

            *Defendants-Appellees.*

No. 12-3218

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:08-cv-2806—David A. Katz, District Judge.

Argued: December 5, 2012

Decided and Filed:  December 17, 2012

Before:  MOORE, GILMAN, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellant. Elizabeth M. Stanton, TAFT STETTINIIUS & HOLLISTER, LLP, Columbus, Ohio, for Appellees. **ON BRIEF:** Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, Erin Elizabeth Mersino, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, James R. Acho, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, Thomas A. Sobecki, Toledo, Ohio, for Appellant. Elizabeth M. Stanton, Sarah D. Morrison, Donald C. Brey, TAFT STETTINIIUS & HOLLISTER, LLP, Columbus, Ohio, for Appellees.

1

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  In 2008, Plaintiff-Appellant Crystal Dixon, an African-American woman and then-interim Associate Vice President for Human Resources at the University of Toledo (the "University"), wrote an op-ed column in the *Toledo Free Press* rebuking comparisons drawn between the civil-rights and gay-rights movements.  Shortly thereafter, Dixon was fired.  Claiming violations of her First and Fourteenth Amendment rights, Dixon subsequently filed a § 1983 suit against the University and Defendants-Appellees University President Lloyd Jacobs and University Vice President for Human Resources and Campus Safety William Logie (collectively, "the defendants").  The district court granted summary judgment to the defendants on all claims, and Dixon appeals.

The issues raised in this appeal turn primarily on the resolution of a narrow inquiry:  whether the speech of a high-level Human Resources official who writes publicly against the very policies that her government employer charges her with creating, promoting, and enforcing is protected.  We conclude that, given the nature of her position, Dixon did not engage in protected speech.  We therefore **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

Dixon began her career at the University in January 2002.  R. 71-4 (Dixon Tr. at 37:8–38:10) (Page ID #1396).  At this time, she was recruited by Logie to become the Administrative Director of Employee Relations at the Medical College of Ohio (the "College").  *Id.*  On July 1, 2006, the College merged with the University, and Dixon was promoted to Associate Vice President for Human Resources for the Health Sciences Campus.  *Id.* 65:2–9 (Page ID #1401).  In July 2007, Dixon was promoted to interim Associate Vice President for Human Resources for both campuses, the position she held

until she was terminated on May 8, 2008.  *Id.* 66:6–14; R. 60-13 (Termination Letter) (Page ID #521).

On April 4, 2008, Michael Miller, Editor-in-Chief of the *Toledo Free Press*, wrote an editorial titled "Gay rights and wrongs."  R. 60-7 (Miller Editorial at 1) (Page ID #501).  In this piece, Miller implicitly compared the civil-rights movement with the gay-rights movement:  "As a middle-aged, overweight white guy with graying facial hair, I am America's ruling demographic, so the gay rights struggle is something I experience secondhand, like my black friends' struggles and my wheelchair-bound friend's struggles."  *Id.*  Miller then focused on a purported denial of healthcare benefits to same-sex couples at the University, explaining that "[w]hen [the College and the University] merged, [University] employees retained the domestic-partner benefits, but [College] employees were not offered them.  So, people working for the same employer do not have access to the same benefits."  *Id.* at 2 (Page ID #502).

On April 18, 2008, Dixon responded to Miller with her op-ed column "Gay rights and wrongs:  another perspective."  R. 60-9 (Dixon Op-Ed at 1–2) (Page ID #507–08).  Dixon addressed both points highlighted above, but did not identify her official position at the University.  *Id.*  Dixon first rejected the comparison made by Miller between the gay-rights and civil-rights movements:

> As a Black woman who happens to be an alumnus of the University of Toledo's Graduate School, an employee and business owner, I take great umbrage at the notion that those choosing the homosexual lifestyle are "civil rights victims."  Here's why.  I cannot wake up tomorrow and not be a Black woman.  I am genetically and biologically a Black woman and very pleased to be so as my Creator intended.  Daily, thousands of homosexuals make a life decision to leave the gay lifestyle evidenced by the growing population of PFOX (Parents and Friends of Ex Gays) and Exodus International just to name a few. . . .

*Id.* at 1 (Page ID #507).  Additionally, Dixon addressed Miller's discussion of the healthcare benefits system at the University:

> The reference to the alleged benefits disparity at the University of Toledo was rather misleading.  When the University of Toledo and

former Medical University of Ohio merged, both entities had multiple contracts for different benefit plans at substantially different employee cost sharing levels. To suggest that homosexual employees on one campus are being denied benefits avoids the fact that ALL employees across the two campuses regardless of their sexual orientation, have different benefit plans. The university is working diligently to address this issue in a reasonable and cost-efficient manner, for all employees, not just one segment.

*Id.*

On April 21, 2008, as a result of her op-ed column, Dixon received a letter placing her on paid administrative leave. R. 60-12 (Administrative Leave Letter at 1–2) (Page ID #518–19). On May 4, 2008, Jacobs wrote a guest column in the *Toledo Free Press* responding to Dixon's op-ed column. R. 60-11 (Jacobs Op-Ed) (Page ID #515). Jacobs stated that "[a]lthough I recognize it is common knowledge that Crystal Dixon is associate vice president for Human Resources at the University of Toledo, her comments do not accord with the values of the University of Toledo." *Id.* Jacobs then explained the various programs instituted at the University aimed at expanding and supporting diversity on campus. *Id.*

A hearing was held on May 5, 2008, at which Dixon read a prepared statement reiterating the beliefs stated in her op-ed column, expressing her view that she had been speaking as a private citizen, and accusing the University of treating her differently than other employees. R. 71-4 (Dixon Dep. 174:1–18) (Page ID #1416); R. 71-8, Ex. KK (Dixon Prepared Statement at 1–3) (Page ID #1530–32). Dixon also asserted that her personal views did not affect her performance as Associate Vice President of Human Resources:

> If the University is taking the Herculean leap to assume that my convictions affect my service to or decisions about those practicing homosexuality, please consider this: it is commonly believed/perceived that there are one, possibly two practicing homosexuals in the Human Resources Department. I hired both of them (one last year and one earlier this year)! I hired both of them with the perception that while they may be homosexual, more importantly they were competent, motivated and simply the best candidates for the jobs. One individual,

> I actually hired this year *after* observing a questionable exchange between he and his male roommate in the parking lot one day. . . .

R. 71-8, Ex. KK (Dixon Prepared Statement at 2) (Page ID #1531).

On May 8, 2008, Dixon received a letter from Jacobs terminating her from the position of Associate Vice President for Human Resources for the following reasons:

> The public position you have taken in the Toledo Free Press is in direct contradiction to University policies and procedures as well as the Core Values of the Strategic Plan which is mission critical. Your position also calls into question your continued ability to lead a critical function within the Administration as personnel actions or decisions taken in your capacity as Associate Vice President for Human Resources could be challenged or placed at risk. The result is a loss of confidence in you as an administrator.

R. 60-13 (Termination Letter) (Page ID #521).

On December 1, 2008, Dixon filed suit in the U.S. District Court for the Northern District of Ohio against the University, Jacobs, and Logie. R. 1 (Compl.) (Page ID #1). The parties stipulated to dismiss Dixon's Equal Pay Act claim, and thus the University, from this case on January 7, 2011. R. 55 (Order at 1) (Page ID #374). On April 29, 2011, Dixon filed a motion for summary judgment, and the remaining defendants cross-moved for summary judgment in response. R. 60 (Pl.'s Mot. for Summ. J.) (Page ID #407); R. 71 (Defs.' Mot. for Summ. J.) (Page ID #1321). The district court granted the defendants' motion, and Dixon appealed. *Dixon v. University of Toledo*, 842 F. Supp. 2d 1044 (N.D. Ohio 2012).

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). We review the evidence and draw all inferences in the light most favorable to the nonmoving party. *Id.* "[O]n cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587,

592 (6th Cir. 2001) (internal quotation marks omitted). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. CONSTITUTIONAL CLAIMS

Dixon appeals the district court order granting summary judgment to the defendants on her First Amendment retaliation claim and her equal-protection claim, as well as the district court's determination that the defendants are entitled to qualified immunity. Dixon argues that the district court erred in its First Amendment retaliation analysis, contending that the defendants "violated [her] right to freedom of speech by terminating her employment because she authored an opinion piece in a local newspaper in which she expressed her *personal* opinion and viewpoint on the issue of homosexuality and civil rights from the perspective of a Christian, African-American woman." Appellant Br. at 15. Dixon further asserts that the district court misapprehended the equal-protection standard, arguing that "when government officials engage in discriminatory treatment based on the exercise of the fundamental right to freedom of speech they violate not only the First Amendment, but they also violate the equal protection guarantee of the Fourteenth Amendment." *Id.* at 34–35.

## A. First Amendment Retaliation

First Amendment retaliation claims are analyzed under a burden-shifting framework. A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct."

*Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (internal quotation marks omitted).

Only the first element, whether the speech was protected, is at issue on appeal.[1] "[W]e have consistently described the question of whether, in a First Amendment retaliation action, a public employee's speech is protected as one of law, not one of both fact and law." *Fox v. Traverse City Area Public Schs. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010); *see also Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011) ("There being no factual dispute regarding what was said, this court treats the question of whether a public employee's speech is protected as a question of law.").

In order to establish that her speech was protected, Dixon must first show that the speech touched on a matter of public concern. *Scarbrough*, 470 F.3d at 255 (citing *Connick v. Myers*, 461 U.S. 138, 142 (1983)). Dixon must then show that under the *Pickering* balancing test, her "free speech interests outweigh the efficiency interests of the government as employer." *Id.* (internal quotation marks omitted) (relying on *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). Finally, Dixon must demonstrate that the speech was not made pursuant to her official duties as Associate Vice President of Human Resources, a causation issue established in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). In sum, Dixon "must satisfy *each* of these requirements: the *Connick* 'matter of public concern' requirement, the *Pickering* 'balancing' requirement and the *Garcetti* 'pursuant to' requirement." *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 338 (6th Cir. 2010).

Because the parties do not dispute that Dixon spoke on a matter of public concern, we turn to whether Dixon satisfies the *Pickering* requirement. The defendants argue that Dixon's speech falls into the presumption set forth in *Rose v. Stephens*, 291 F.3d 917 (6th Cir. 2002). If this presumption applies, then Dixon's speech is not protected as a matter of law. Alternatively, the defendants argue that under the

---

[1]Termination is an adverse employment action, and it is clear that Dixon was terminated because of her speech. *See v. City of Elyria*, 502 F.3d 484, 494 (6th Cir. 2007) (concluding that, when terminated, "See undeniably suffered an adverse action").

traditional *Pickering* balancing test, the balance of interests weighs in favor of the defendants rather than Dixon. The district court addressed both issues, concluding that the presumption applied to Dixon and that "the balance of [Dixon's] interest in making a comment of public concern is clearly outweighed by the University's interest as her employer in carrying out its own objectives." *Dixon*, 842 F. Supp. 2d at 1051, 1053.

The *Rose* presumption dictates that "where a confidential or policymaking public employee is discharged on the basis of speech related to his political or policy views, the *Pickering* balance favors the government as a matter of law." *Rose*, 291 F.3d at 921. Therefore, in order for the presumption to apply, Dixon must (1) hold a confidential or policymaking position, and (2) have spoken on a matter related to political or policy views. *See Silberstein v. City of Dayton*, 440 F.3d 306, 319 (6th Cir. 2006) ("Thus, if Silberstein occupied a policymaking position as Assistant Chief Examiner, and if her letter to the editor related to her policy views, then her free speech interests presumptively lose out to the city of Dayton's interests in efficiently running its government."). An application of this presumption "renders the fact-intensive inquiry normally required by *Pickering* unnecessary because under these circumstances it is appropriate to presume that the government's interest in efficiency will predominate." *Rose*, 291 F.3d at 923.

Although there is no clear line drawn between policymaking and non-policymaking positions, we have previously outlined the following four categories of individuals to whom the *Rose* presumption will always apply:

> "**Category One:** positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;
>
> **Category Two**: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;

> **Category Three:** confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors; and
>
> **Category Four:** positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies."

*Latham v. Office of Attorney Gen. of Ohio*, 395 F.3d 261, 267 (6th Cir. 2005) (quoting *McCloud v. Testa*, 97 F.3d 1536, 1557–58 (6th Cir. 1996)).  "In determining whether an employee falls into one of these categories, we must examine the inherent duties of the position, rather than the actual tasks undertaken by the employee." *Id.*  "While the inherent duties of the position are not necessarily those that appear in the written job description and authorizing statute, such descriptions can be instructive." *Id.* (internal quotation marks omitted).

The district court determined that as Associate Vice President for Human Resources, Dixon "was vested with a significant portion of the statutory authority available, placing her within category two." *Dixon*, 842 F. Supp. 2d at 1051.  The district court reasoned that her delegated appointing authority, including the authority to hire and fire, was significant and discretionary. *Id.*  Dixon contends on appeal that the district court erred in reaching this conclusion because "[a]lthough [Dixon] had authority to make some hiring decisions . . . she had *no* discretion to make policy regarding hiring practices nor was she delegated *any* such authority, let alone a 'significant portion' of it.  Moreover, she had *no* authority, delegated or otherwise, to make any other policy of political concern."  Appellant Br. at 26 (emphasis in original).

In Resolution No. 07-10-10, effective October 1, 2007, the Board of Trustees of the University delegated appointing authority to the Associate Vice President for Human Resources.  R. 71-3, Ex. D (Resolution at 1) (Page ID #1387).  Further, the official job description for Associate Vice President for Human Resources, which Dixon verified as accurate in her deposition, listed the most important job duty as "Policy Development

and Application." R. 71-4 (Dixon Tr. at 50:12–51:10) (Page ID #1399); R. 71-8, Ex. C (Job Description at 1–2) (Page ID #1447–48). Specifically, this duty requires that the Associate Vice President "[p]rovide leadership in recommending, implementing and overseeing human resource policies and procedures that support the university's strategic direction; reflect fair and equitable practices; and that are a model for innovative regulatory compliant and contemporary practice." R. 71-8, Ex. C (Job Description at 2) (Page ID #1448). The job description further notes that the Associate Vice President directs employee relations and "represent[s] the University in relevant employee relations actions brought before the . . . Ohio Civil Rights Commission, Equal Employment Opportunity Commission, . . . and other federal and state regulatory agencies." *Id.*

Additionally, Dixon's own testimony regarding her job responsibilities reflects significant discretionary authority. Dixon testified that she was responsible for answering grievances, issuing disciplinary and corrective action, serving on various task forces, supervising approximately forty employees, overseeing benefits administration, setting compensation, and making presentations at town-hall meetings. R. 71-4 (Dixon Tr. at 40:11–43:4, 44:19-46:21) (Page ID #1396–98).

This evidence establishes that Dixon was delegated appointing authority and was responsible for recommending, implementing, and overseeing policy. *See Hager v. Pike Cnty. Bd. of Educ.*, 286 F.3d 366, 376 (6th Cir. 2002) ("Moreover, in determining whether an employee occupies a policymaking position, consideration should be given to whether the employee formulates plans for the implementation of broad goals.") (internal quotation marks and alterations omitted). The district court was thus correct in determining that these responsibilities constituted a policymaking position, i.e., that Dixon, as Associate Vice President for Human Resources, was a category-two policymaker.

In addition to holding a policymaking position, Dixon must have spoken on a political or policy issue in order to be subject to the *Rose* presumption. In *Rose*, we reasoned that "[t]he additional restriction that this presumption applies only to cases

where the employee speaks on political or policy issues ensures that the content of the employee's speech directly implicates the loyalty requirements of the position and thus will adversely affect a central aspect of the working relationship in all cases." 291 F.3d at 923. Dixon argues that her op-ed column expressed a matter of personal concern and "was not speech that relates to either [her] political affiliation or substantive policy." Appellant Br. at 26–27 (internal quotation marks and emphasis omitted).

Dixon's argument, however, ignores critical policies developed in and promoted by the Human Resources Department at the University. Dixon's public statement implying that LGBT individuals should not be compared with and afforded the same protections as African-Americans directly contradicts several such substantive policies instituted by the University. For example, the University's Strategic Plan included pursuing a strategy that will "[r]ealize the strength and distinction to be derived from diversity in all its dimensions [and] recruit, retain, and celebrate a diverse university community." R. 71-8, Ex. N (Strategic Plan at 11) (Page ID #1464). Additionally, the University enacted a Plan for Diversity that explicitly included sexual orientation. R. 71-8, Ex. P (Plan for Diversity at 1) (Page ID #1471). The University also included sexual orientation and gender identity and expression in its Equal Opportunity Policy and in its anti-harassment policy. R. 71-8, Ex. S (Equal Opportunity Policy at 1) (Page ID #1494); R. 71-8, Ex. T (Sexual Harassment Policy at 1) (Page ID #1497). Finally, as explained by Jacobs in his op-ed column, the University enacted the Spectrum Safe Places Program, which encourages "faculty, staff and graduate assistants and resident advisers to open their space as a Safe Place for Lesbian, Gay, Bisexual, Transgender, Queer, and Questioning . . . individuals." R. 60-11 (Jacobs Opinion at 1) (Page ID #515).

Although Dixon correctly contends that she never explicitly stated that the University diversity policies should not extend to LGBT students and employees, by voicing her belief that members of the LGBT community do not possess an immutable characteristic in the way that she as an African-American woman does, the implication is clear: Dixon does not think LGBT students and employees of the University are

entitled to civil-rights protections, even though the University, in part through the Human Resources Department, expressly provides them. In writing her op-ed column, Dixon not only spoke on policy issues, but also spoke on policy issues related directly to her position at the University. *See Rose*, 294 F.3d at 925 ("All of these issues are clearly related to police department policies and the memorandum thus fits easily within the scope of the exception.").

In sum, the *Rose* presumption applies to Dixon because there is evidence establishing that she was a policymaker who engaged in speech on a policy issue related to her position. The government's interests thus outweigh Dixon's interests as a matter of law, and we affirm the district court's grant of summary judgment to the defendants on this basis. Because the *Rose* presumption is dispositive, it is unnecessary for us to consider the district court's *Pickering* and *Garcetti* analyses.

## B. Additional Challenges to the University's Speech Policy

Dixon also argues that the defendants "maintain unbridled discretion to punish University employees for expressing disfavored opinions in violation of the First Amendment." Appellant Br. at 32. The district court construed this argument as two claims—vagueness and viewpoint discrimination. *Dixon*, 842 F. Supp. 2d at 1054. The district court addressed these claims together and concluded that Dixon "has not presented any law applying these principles to the employment, rather than sovereign, context" and that "the damage she did to her ability to perform her job and to the University provide ample justification for her termination." *Id.* at 1054 & n.4.

On appeal, Dixon's argument presents the same flaws. To begin, as in the district court, she provides no meaningful case law in support of her vagueness challenge.[2] Moreover, Dixon does not provide any evidentiary support for her argument. Mere

---

[2] The only Sixth Circuit case cited by Dixon, *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341 (6th Cir. 1998), addresses a due-process challenge to a state-agency restriction on controversial advertisements. *Id.* at 359. Dixon also relies upon *Child Evangelism Fellowship of South Carolina v. Anderson School District Five*, 470 F.3d 1062 (4th Cir. 2006), a Fourth Circuit case that analyzes viewpoint discrimination as it applies to a school district's fee-waiver system.

claims that the University does not have "objective criteria for determining whether a particular opinion expressed by a University employee is sufficiently 'offensive' or 'discriminatory' to warrant its prohibition by terminating the speaker's employment" are insufficient at the summary-judgment stage. Appellant Br. at 32. In fact, Dixon fails even to describe or reference the policy that she claims is vague and discriminatory. We therefore affirm the district court's grant of summary judgment in favor of the defendants on these challenges to the University's speech policy.

## C. Equal-Protection Claim

Dixon also alleges an equal-protection claim against the defendants, arguing on appeal that the defendants "punished Plaintiff because she expressed a 'less favored' viewpoint—one grounded in her strong Christian faith no less—in this very same forum in violation of the First Amendment (freedom of speech) *and* the Fourteenth Amendment (equal protection)." Appellant Br. at 34. The district court granted summary judgment to the defendants on this claim because Dixon "has not presented anyone who was 'similarly-situated' and engaged in similar conduct." *Dixon*, 842 F. Supp. 2d at 1055.

"The Equal Protection Clause prohibits a state from denying to any person within its jurisdiction the equal protection of the laws." *Scarbrough*, 470 F.3d at 260 (internal quotation marks omitted). "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Id.* "Fundamentally, the Clause protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Id.* Although Dixon recites this standard in her argument, she has failed to produce sufficient evidence in support of her equal-protection claim. To begin, as discussed above, she has not shown that the defendants violated a fundamental right, as her speech was not protected. Moreover, Dixon has not shown that the individuals she argues were allowed to engage in public speech on the issue of LGBT rights and protections without penalty—Jacobs and Vice Provost Carol Bresnahan—are similarly situated.

Dixon's comparison with Jacobs is easily distinguishable. Jacobs, as President of the University, wrote an op-ed column detailing the University's stance on diversity, specifically as it relates to sexual orientation. R. 60-11 (Jacobs Op-Ed) (Page ID #515). Jacobs was speaking in his official capacity as the President of the University in order to explain the University's position on a policy matter. Dixon, on the other hand, wrote an op-ed column that was not commissioned by the University and that contradicted the very policies that she was charged with creating, promoting, and enforcing.

The comparison with Bresnahan, although intuitively more germane, fails because it is unsupported by sufficient evidence in the record. The evidence proffered by Dixon establishes that in December 2007, Bresnahan and her partner "became the first same-sex couple to file under the city's new domestic-partner registry." R. 60-14 (Bresnahan Article at 1) (Page ID #523). After she and her partner filed under the registry, Bresnahan was interviewed by the *Toledo Blade* and made the following statement regarding opposition of others to the registry: "It's their religious beliefs, and bigotry in the name of religion is still bigotry." *Id.* at 1–2 (Page ID #523–24). Bresnahan was identified as Vice Provost of the University in the article, yet she was not terminated or disciplined as a result of this statement. *Id.* at 1 (Page ID #523); R. 60-5 (Jacobs Tr. at 218:15–24) (Page ID #476).

Importantly, however, the record is silent as to the responsibilities and authority of the vice-provost position at the University. "Inevitably, the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 463 (6th Cir. 2012) (internal quotation marks omitted). In this case, the critical inquiry centers on Dixon's role at the University. Therefore, in order to determine whether Bresnahan and Dixon are similarly situated, we must at the very least have before us a description of the duties inherent in Bresnahan's role at the University. Without such evidence, we cannot engage in an accurate comparison of the two individuals for the purposes of summary judgment in this case. Although Dixon has identified another administrator at the University who also spoke publicly on the issue of LGBT rights, Dixon has not shown that Bresnahan is

similarly situated. We thus affirm the district court's grant of summary judgment in favor of the defendants on the equal-protection claim.

## D. Qualified Immunity

Finally, Dixon argues that the defendants are not entitled to qualified immunity. Appellant Br. at 35. However, given that Dixon has not shown a violation of her constitutional rights, we affirm the district court's determination that "the Court need not consider whether such rights were 'clearly established' at the time of her termination." *Dixon*, 842 F. Supp. 2d at 1055.

## IV. CONCLUSION

For the stated reasons, we **AFFIRM** the decision of the district court granting summary judgment in favor of the defendants.