**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 18a0168n.06**

**No. 17-1866**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Mar 30, 2018
DEBORAH S. HUNT, Clerk

DAVID FERRIS, II,

      Plaintiff-Appellant,

v.

CITY OF CADILLAC, MICH., et al.,

      Defendants,

SPARROW HEALTH SYSTEM, et al,

      Defendants-Appellees.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

BEFORE:    MERRITT, CLAY, and SUTTON, Circuit Judges.

**CLAY, Circuit Judge.** Plaintiff David Ferris II was charged with the murder of his girlfriend's nineteen-month-old daughter, but the charges were ultimately dropped. Plaintiff subsequently brought suit against three medical professionals whose medical opinions formed the basis of the prosecutor's decision to charge him, alleging constitutional violations under 42 U.S.C. § 1983. Plaintiff appeals the district court's decision granting summary judgment for Defendants on the grounds of qualified immunity. For the reasons set forth below, we **AFFIRM**.

## BACKGROUND

### A.     Factual Background

#### 1.  The Death

On January 16, 2013, Plaintiff was babysitting his girlfriend's eighteen-month-old daughter, Kalla Fisher, when she purportedly fell down some basement stairs and struck her head on cement.  Later that night, Jesse Fisher, Kalla's mother and Plaintiff's then-girlfriend,[1] returned home, and she and Plaintiff checked on Kalla throughout the night.  The next morning, Jesse noticed some slight swelling and bruising on the child, but took Kalla to daycare.  The daycare provider later contacted Jesse to tell her that the bruising and swelling had worsened.  Jesse picked up Kalla and took her to the emergency room.  Medical records show that a CT-scan revealed no skeletal fractures or dislocations.  As mandatory reporters, emergency room personnel reported the incident to the Grayling Police Department and Children's Protective Services ("CPS").

The next day, Kalla's pediatrician, Dr. Joanna Nigrelli, diagnosed Kalla with "a head contusion and the bruising or [ecchymosis] related to that contusion," but did not see a need to hospitalize her.  (R. 197-2, Preliminary Exam., PageID # 5749.)  Dr. Nigrelli reported to CPS that she did not think child abuse caused the injury.  Based in part on Dr. Nigrelli's examination, CPS determined that the "injury appear[ed] to be an accident." (R. 197-2, Grayling Police Record, PageID # 5674.)  CPS and Grayling Police both dismissed the complaint of possible child abuse.

On the night of February 15, 2013, Jesse and Kalla stayed overnight at Plaintiff's home.  Jesse put Kalla to bed around 8:30 p.m.  Plaintiff later explained that around 11:15 p.m. that evening, he had allowed Kalla and his seven-year-old daughter to join him in the room where he

---

[1] The two have since married.

was watching television. And sometime around midnight, Kalla vomited. After cleaning it up, Plaintiff put Kalla and his daughter back to bed and went to bed himself. Jesse found Kalla unresponsive around 9:30 a.m. the next morning. Plaintiff performed CPR until emergency responders arrived, and Kalla was pronounced dead at Mercy Hospital at 10:13 a.m.

The Wexford County Medical Examiner, Dr. Fred Wreford, assigned responsibility for Kalla's autopsy to Defendant Sparrow Health System ("Sparrow"). Defendant Dr. Joyce de Jong, a forensic pathologist employed by Sparrow, was assigned the autopsy. Dr. de Jong performed the autopsy on Sunday, February 17, 2013, accompanied by two autopsy assistants and Cadillac Police Department Detective Todd Golnick. Detective Golnick spoke with Dr. de Jong before the autopsy and told her what he knew about the situation, the history of Jesse and Plaintiff's relationship, and who had been around Kalla prior to her death.

Dr. de Jong's Autopsy Report issued on April 26, 2013. Her findings revealed acute head trauma and multiple contusions and cutaneous injuries. The Autopsy Report notes that the skull was free of fractures and that the brain appeared swollen. In a section titled "Opinions," Dr. de Jong identified the cause of death as "Traumatic Head Injuries" and the manner of death as "Homicide." (R. 210-2, Autopsy Report, PageID # 9510.)

An addendum report was prepared by Defendant Dr. Rudolph J. Castellani, a pathologist, which summarized the results of a neuropathology consultation he conducted. The addendum details Dr. Castellani's "final neuropathologic diagnoses" as (1) acute head trauma, with bilateral subdural hemorrhage, patchy acute subarachnoid hemorrhage, bilateral intraretinal and optic nerve sheath hemorrhages, and bilateral optic nerve sheath hemorrhage; (2) cerebral edema and tonsillar herniation secondary to acute head trauma. Castellani concluded his addendum with the

comment that "the findings indicate inflicted head trauma resulting in death." (R. 210-2, Castellani Addendum, PageID # 9518.)

On May 1, 2013, Dr. Fred Wreford issued Kalla's death certificate, which relied exclusively on Doctors de Jong and Castellani's opinions. The death certificate specifies the causes of her death as cerebellar herniation occurring minutes before death, bilateral subdural hematomas and multiple blunt force traumas occurring hours before death, and child abuse occurring weeks before death. The certificate further identifies the manner of death as homicide.

2. The Investigation

Detective Golnick, who was present during the autopsy, had told Wexford County Prosecutor Anthony Badovinac that he planned to attend the autopsy because Kalla's death might have resulted from child abuse. According to Det. Golnick, Dr. de Jong told him that she concluded that Kalla died from "a head injury caused by blunt trauma" and that "it would have been inflicted by an adult-sized person." (R. 199-14, Golnick Dep., PageID # 7275.) Dr. de Jong also told Det. Golnick that the "injuries she observed were acute and they were not chronic . . . [and] [t]hat they would have happened very recently." (*Id.* at PageID # 7276.) On the strength of Doctors de Jong and Castellani's reports and the resulting death certificate, the police, the county prosecutor's office, and CPS launched an investigation into the circumstances of Kalla's death.

While these investigations were ongoing, Kalla's grandparents asked a family acquaintance, Dr. Aaron Ormsby, to review Kalla's medical records. Dr. Ormsby, a board-certified pathologist and the Division Head of Anatomic Pathology at Henry Ford Hospital, issued a written opinion dated February 12, 2014. Although Dr. Ormsby's report noted that he was "in complete agreement" with the autopsy's findings, he questioned the report's

conclusions regarding the causes and manner of Kalla's death. (R. 206-3, Ormsby Report, PageID # 9067.) Specifically, he saw other potential explanations for Kalla's death: "Namely, the combination of Kalla's strabismus,[2] familial bleeding tendency[3] and her playful age." (*Id.* at PageID # 9068.)

Jennifer Helsel, then a CPS worker assigned to the Ferris case, recruited Defendant Dr. Carl Schmidt, a forensic pathologist, to review the circumstances of Kalla's death. Dr. Schmidt reviewed Kalla's autopsy report, autopsy pictures, emergency room records from February 16, 2013, and records from law enforcement agencies and CPS. On February 12, 2014, he issued his report. His findings paralleled those of Dr. de Jong. He concluded that "this 19 month-old female suffered multiple blunt trauma, mainly to the head, and is the cause of death. The appearance of the injuries indicate that they happened acutely." (R. 210-3, Schmidt Report, PageID # 9536.) Dr. Schmidt opined that "[t]he clinical history, i.e., found dead in the morning without an explanation for the multiple blows, subdural hemorrhage and swelling of the brain, indicates that this child was a victim of child abuse and hence appropriately certified as homicide." (*Id.*)

### 3. The Charges

Upon learning that Dr. Schmidt concurred with Doctors de Jong and Castellani about the cause of Kalla's death, Prosecutor Badovinac decided to charge Plaintiff with open murder. At the Preliminary Examination, Dr. de Jong was asked how Kalla died. She replied, "I can say that she sustained blunt force injuries and lethal head injuries." (R. 210-16, Preliminary Exam., PageID # 9901.) She testified that the cause of death was "traumatic head injuries" that were "recent injuries," occurring minutes to hours before Kalla's death. (*Id.* at PageID # 9898–99.)

---

[2] Also known as Duane's Syndrome, a vision disorder that affects depth perception.

[3] Medical testing revealed that Kalla did not have the familial bleeding tendency Dr. Ormsby mentions.

Dr. de Jong further testified that she "believe[d] [Kalla's] injuries were intentionally inflicted." (*Id*. at PageID # 9962.) Asked whether a seven-year-old (presumably referring to Plaintiff's daughter) could have caused the lethal impact, Dr. de Jong responded, "I don't believe that" (*Id.* at PageID # 9964), and, when asked again, "I don't believe so." (*Id.* at PageID # 9965.)

Dr. Ormsby also testified at the Preliminary Examination. He opined that Kalla "had a major trauma when she fell down the stairs in January . . . [and that] what actually happened on that night [a month later] is she had a massive intracranial bleed that led to an increased intracranial pressure that led to her demise." (*Id.* at PageID # 9985.) At the close of the Preliminary Examination, the court determined that there was enough evidence to bind the case over for trial. (*Id.* at PageID # 10006.)

Plaintiff's counsel in the criminal case requested that Dr. Ljubisa J. Dragovic, a forensic pathologist and neuropathologist, review the Autopsy Report and other medical records. Dr. Dragovic found that "the toddler Kalla Fisher died of bronchopneumonia complicating her head trauma.[4] What remains unclear is when the toddler sustained the head trauma." (R. 210-14, Dragovic Report, PageID # 9848.) Dr. Dragovic saw no evidence of an intentional infliction of head trauma in the materials he reviewed. He described Dr. Castellani's review as an "incomplete professional diagnostic work-up." (*Id.* at PageID # 9849.) Wexford County Prosecutors met with Dr. Dragovic in September 2014, and Dr. Dragovic advised them that, in his opinion, an earlier injury caused Kalla's death. At the conclusion of this meeting, the prosecutors decided to reevaluate whether to pursue the criminal case.

---

[4] The district court noted that "no other medical expert has identified pneumonia as contributing to Kalla's death." (R. 247, Order, PageID # 14363.)

Prosecutor Badovinac forwarded Dr. Dragovic's report to Dr. Schmidt and asked for his comments. Dr. Schmidt reiterated his opinion that "this girl was killed. Period. She was beaten to death . . . . The subdural hemorrhage is textbook child abuse." (R. 210-5, Schmidt-Badovinac Email, PageID # 9540.) After examining the input they had received from all the doctors, prosecutors decided that, in light of "competing medical opinions," they were unlikely to be able to persuade a jury beyond a reasonable doubt of Plaintiff's guilt. (R. 200-9, Trautner Dep., PageID # 7772; R. 200-7, Badovinac Dep., PageID # 7703.) In November 2014, the Wexford County Prosecutor dismissed the charges with prejudice.

## B. Procedural History

In June 2015, Plaintiff brought suit in federal district court against Defendants Sparrow Health System, Dr. de Jong, Dr. Castellani, and Dr. Schmidt, alleging violation of his constitutional rights under 42 U.S.C. § 1983.[5] Plaintiff alleges that the medical opinions the three physicians provided, and on which the police and prosecutors based their charges, were constitutionally defective. He brought claims under a theory of unlawful seizure and malicious prosecution under the Fourth and Fourteenth Amendments. Plaintiff alleged that these Defendants fabricated the opinion evidence upon which the decision to charge and arrest him was made.

The parties filed cross-motions for summary judgment. In Plaintiff's motion, he argued that Defendants' opinions were recklessly made and were "far afield of what a reasonable medical examiner/forensic pathologist could conclude from the facts of this case," thereby constituting the fabrication of evidence. (R. 197, Brief in Support of Plaintiff's Motion for Summary Judgment, PageID # 5574.) Plaintiff supported his motion with the opinions of two

---

[5] The claims against Defendants County of Wexford and Dr. Fred Wreford, and Defendants City of Cadillac and Todd Golnick, have been settled and dismissed with prejudice and do not factor into this appeal.

experts, Dr. Mark J. Shuman and Dr. Janice J. Ophoven, as well as with statements from Defendants' expert, Dr. Stephen Cina, and testimony from Defendants. Defendants argued that the evidence established only an honest and good faith difference of opinion among the experts and that the Complaint arguably raises only a claim of negligence and not a claim of fabrication necessary to establish a § 1983 violation.

Following oral argument, the district court granted Defendants' Motions for Summary Judgment on the grounds that Defendants were entitled to qualified immunity because there was no evidence that Defendants fabricated evidence. Plaintiff filed a timely notice of appeal.

## DISCUSSION

### Standard of Review

We review a district court's grant of summary judgment *de novo*. *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012). "Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015). "We review the evidence and draw all inferences in the light most favorable to the nonmoving party." *Dixon*, 702 F.3d at 273.

### Analysis

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). The doctrine of qualified immunity is based on the concern that "[w]hen officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent

criteria that ought to guide their conduct." *Forrester v. White*, 484 U.S. 219, 223 (1988). Therefore, "[q]ualified immunity 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam)).

This Court follows a two-step inquiry to determine whether to apply qualified immunity. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). "The first step is to determine if the facts alleged make out a violation of a constitutional right." *Id.* "The second is to ask if the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* "Plaintiff bears the burden of showing that defendants are not entitled to qualified immunity." *Seales v. City of Detroit*, No. 17-1096, 2018 WL 627106, at *2 (6th Cir. Jan. 31, 2018) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)). At summary judgment, the question is whether the facts, when construed most favorably to Plaintiff, show that Defendants violated Plaintiff's clearly established constitutional rights.

This Court has held that "a forensic expert may be subject to suit under § 1983 for deliberately withholding the existence of exculpatory forensic evidence or fabricating forensic evidence." *Moldowan v. City of Warren*, 578 F.3d 351, 397 (6th Cir. 2009). We have also said that "[i]t is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) (citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)); *see Robertson v. Lucas*, 753 F.3d 606, 616 n.5 (6th Cir. 2014) ("A Fourth Amendment claim for fabrication of

evidence lies where a defendant knowingly manufactures probable cause, thereby effecting a seizure.") (citing *Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999)).  Similarly, to succeed on a Fourth Amendment malicious prosecution claim, a plaintiff must prove that the defendant made "'deliberate or reckless falsehoods,' and 'mere negligence' will not create liability."  *Caminata v. County of Wexford*, 664 F. App'x 496, 500 (6th Cir. 2016) (quoting *Johnson*, 790 F.3d at 655).  We have observed that a criminal defendant's right to be free from prosecution based on fabricated evidence existed at least as early as 1992.  *Gregory*, 444 F.3d at 744 n.8.  Thus, the only question remaining for this Court on appeal is whether Plaintiff has introduced sufficient facts to show that Defendants violated his constitutional rights by knowingly or recklessly producing false evidence.  We hold that Plaintiff has failed to do so.

Plaintiff asserts that Defendants fabricated their expert opinions on three key points: first, that Kalla's injuries were intentionally inflicted; second, that her injuries occurred within minutes to hours of her death; and third, that given the amount of force necessary, her injuries had to have been inflicted by an adult-sized person.  To make his case, Plaintiff relies heavily on *Gregory*, a case involving a forensic examiner's inaccurate report regarding the number of hairs she recovered from a rape scene.  444 F.3d 725.  Although the examiner testified that she had "found five hairs," and that these hairs matched the plaintiff's hair, a later deposition revealed that the examiner had actually recovered seven hairs, two of which were non-matching.  *Id.* at 732, 734.  Further, the plaintiff alleged that none of the hairs were in fact a match, and the plaintiff's expert testified that the examiner's findings were "*far afield* of what any reasonable forensic examiner would find from the evidence[.]"  *Id.* at 744 (emphasis added).  The court held that summary judgment was inappropriate, finding that a reasonable jury could conclude that the

examiner "deliberately withheld the existence of those two nonmatching hairs" and "fabricated her report." *Id.*

Plaintiff has latched onto the "far afield" language in *Gregory* and invokes it at every turn to argue that his expert's contrary opinions show that Defendants fabricated evidence. But, of course, mere assertion of a legal standard is not enough to create a triable issue of fact. *See Mills v. Barnard*, 869 F.3d 473, 481 (6th Cir. 2017) ("To be sure, the plain statement that Jenkins 'intentionally, maliciously, [or] with … reckless disregard' subjected Mills to malicious prosecution is insufficient standing on its own.") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009)) (alteration in original). Moreover, *Gregory* did not create a new "far afield" standard for fabrication; it simply recognized that whether evidence is "fabricated" will often turn on circumstantial evidence and some expert reports can be so grossly deficient that they raise a triable issue of fact as to whether the explanation for their deficiency is fabrication. That was precisely the situation in *Gregory*: the Court concluded that the defendant's report was so deficient that a reasonable jury could find that the defendant's conclusions were not just wrong but fabricated.

This case is different. In *Gregory*, "the allegedly false forensic report and testimony did not arise from a flawed investigation; rather, the examiner admitted knowing there were seven hairs, yet chose to report only five." *Caminata*, 664 F. App'x at 500 (citing *Gregory*, 444 F.3d at 744–45). In this case, there is no evidence to suggest that Defendants' reports contained deliberate omissions or reckless falsehoods.

Plaintiff's primary evidence supporting his claim is his own experts' opinions. He relies on the opinions of Doctors Ormsby and Dragovic in his criminal case, as well as expert reports

from Doctors Janice Ophoven and Mark J. Shuman, who were retained for his civil case to argue that Defendants were reckless in concluding that Kalla's injuries were intentionally inflicted.

Dr. Ophoven identifies numerous errors in the analysis and conclusions of Defendants. In her expert report, she claims that Dr. de Jong:

> [F]ormulated her conclusions in this case without obtaining the medical records from the prior fall in Grayling, the photos of the bruising from the prior fall in Grayling, or the medical records from Kalla Fisher's treating pediatrician. It is expected that a medical examiner obtain all of these materials before rendering any opinions regarding the cause and manner of death and timing of injury.

(R. 197-7, Ophoven Report, PageID # 6677.)  She further claims that Dr. Castellani should not have opined on the manner of death, but instead "should have performed the analysis he was contracted to perform and not reached opinions that were outside his training and experience." (*Id.*)  And as for Dr. Schmidt, Dr. Ophoven asserts that for him to have reached conclusions "as to the cause and manner of death without reviewing the slides [(*i.e.*, the slides that were prepared as part of the autopsy report)] is far afield of what any reasonable forensic pathologist would have done."  (*Id.* at PageID # 6678.)  In her opinion:

> [A] full review of the materials that were available at the time of the autopsy should have led to a conclusion that the manner of death was undetermined. To conclude that this was a homicide based upon the materials that were available and the investigation that was performed was far afield of what any reasonable forensic pathologist would conclude from the evidence.

(*Id.* at PageID # 6677.)  However, Dr. Ophoven's report also notes that the medical findings do "raise concerns for head injury associated with abuse."  (*Id.* at PageID # 6674.)  And her report recognizes that "the case has findings raising concerns of a suspicious death," though she ultimately concludes that "in the final analysis there is insufficient evidence available to determine what happened to the little girl."  (*Id.* at PageID # 6676.)  Similarly, Dr. Shuman concluded that the manner of death could not be determined, but he also found that Kalla's head

injury "could have occurred accidentally or could have been inflicted by an adult or child." (R. 210-12, Shuman Report, PageID # 9788.) Significantly, no expert retained in this case has offered the opinion that Kalla's death was, in fact, an accident.

Plaintiff argues that his experts' opinions show that Defendants could not have concluded from the available medical evidence that Kalla's injuries were intentionally inflicted. Simply put, because Doctors Ophoven and Shuman concluded that the injuries could have been caused accidentally, Plaintiff argues that Defendants' contrary conclusions raise the specter of fabrication. (Brief for Appellant at 41 ("Defendants' unequivocal opinions/conclusions that Kalla's injuries were intentionally inflicted were far afield of what reasonable medical examiners/forensic pathologists could conclude.").) But this is not sufficient to show fabrication. The question for this court is not whether a self-interested litigant can find an expert to say the defendants got it wrong, but whether the evidence—including any expert opinions—creates a genuine issue of material fact that Defendants fabricated that evidence. And "[a]lthough [Plaintiff's expert evidence] impugns the quality of [Defendants'] investigation, it is insufficient to establish knowing fabrication or deliberate or reckless falsehoods, rather than mere negligence." *Caminata*, 664 F. App'x at 501.

Dr. de Jong testified that the pattern of bruises seen on Kalla created a suspicion of child abuse and that the absence of a clear explanation for the injuries also supported that conclusion. She also testified that the severity of the injuries convinced her that the death was due to inflicted trauma. She explained that, as a forensic pathologist, she was expected to consider the factual information she was given and determine whether the explanation fit the medical findings. And even Plaintiff's expert, Dr. Shuman, agreed that a forensic pathologist has to interpret findings "in a context of what was going on with the child." (R. 205-15, Shuman Dep., PageID # 8826.)

13

Nonetheless, although Plaintiff's experts acknowledge that the medical evidence could support a conclusion of intentional injury, they believe that it was inappropriate for Dr. de Jong to have reached such a conclusion. Plaintiff's expert evidence may indeed suggest that Dr. de Jong's conclusion was premature, but Plaintiff has introduced no evidence to suggest that this error (if indeed there was one) was intentional or recklessly made. Further, since there was nothing obviously deficient about Dr. de Jong's conclusions, we cannot say that Dr. Castellani or Dr. Schmidt fabricated evidence insofar as they relied on those conclusions or drew parallel ones.

Plaintiff also challenges Defendants' opinions that Kalla's injuries were inflicted within minutes to hours of her death. Plaintiff asserts that this conclusion was "far afield of what a reasonable medical examiner/pathologist could conclude from the evidence in this case." (Brief for Appellant at 35.) In support, Plaintiff cites the opinion of Defendants' own expert, Dr. Stephen Cina, who explained that the evidence indicated the presence of "fresh (hours to a few days) bleeding at the site of scalp contusion." (R. 197-7, Cina Report, PageID # 6765.) Plaintiff also relies on his own expert, Dr. Dragovic, who called Defendant de Jong and Castellani's conclusions that the trauma occurred within a few hours of death "ridiculous." He asserted that there had been an "incomplete and inadequate assessment of the degree of organization of subdural hemorrhage," which demonstrated that the injuries had begun healing days or weeks earlier. (R. 205-4, Dragovic Report, PageID # 8601.) Further, Dr. Dragovic maintained that it was necessary to do an "iron stain" of various tissue slides to identify evidence of healing, and he denied any sign of fresh subdural hemorrhage. [6] (*Id.* at PageID # 8601.) Plaintiff's evidence shows little more than a professional disagreement, and is not sufficient to show fabrication.

---

[6] Dr. Schmidt sent an email to the prosecutor after having seen Dr. Dragovic's conclusions, in which he wrote that "[y]ou don't need an iron stain, which will show very little or nothing because of the acute nature of the injuries. We would not have done an iron stain either, and no one in Michigan sees more child abuse [cases] than we do." (R. 205-6, Schmidt Email, PageID # 8605.)

Moreover, Plaintiff's smoking gun evidence is testimony from Dr. de Jong, herself, in which she acknowledges that Kalla's injuries could have occurred 24–48 hours before her death. But context is important. In relevant part, Dr. de Jong testified as follows:

> Q. Okay. Your opinion is that the trauma that caused this child's death occurred somewhere . . . around 12 or 1 a.m. and when she's found unresponsive at 9 in the morning. Correct?
> A. I think that's the most likely but it could have been earlier.
> Q. It could have been earlier; how much earlier?
> A. That's uncertain. Hours. It could be hours earlier.
> Q. Would you agree with me that it's your opinion that it couldn't have been more than 24 hours?
> A. *I don't believe* it was more than 24 hours, no.
> Q. Is that based upon history or is that based upon pathological findings?
> A. Based upon the literature. It's based upon some of it with the history.
> Q. In other words, if I, if I ask you to look at this case pathologically with zero history. So the body comes in. You have Kalla Fisher's body. You do the Autopsy Report. You do the autopsy. You do all your slides and your examination and your radiological studies and the histopathology and the brain – you do everything the same but you have no history. Would you be able to time the brain bleed based upon pathological findings in this case?
> A. If you're working in a vacuum like that, it, it's probably within 24 hours or so, 24, maybe 48.

(R. 197-5, de Jong Dep., PageID # 6402–03 (emphasis added).) Dr. de Jong made clear that when she drew her conclusions, she was not looking solely at the medical data before her, but interpreting that data in the context of her background understanding of the circumstances leading up to Kalla's death. That she used this information to draw a conclusion different from Plaintiff's experts—a conclusion that none of Defendants' experts suggest is foreclosed by the medical evidence—does not suggest fabrication.

Finally, as for whether Kalla's injuries had to have been inflicted by an adult, Plaintiff contends that Defendants "were not qualified to give testimony regarding the amount of force necessary to cause Kalla's injuries." (Brief for Appellant at 38.) He therefore concludes that "there can be no question that any conclusions by the Defendants[] offered to the police and the

Prosecutor's Office that Kalla's injuries could only have been inflicted by an adult were made with reckless disregard and were far afield of what a reasonable medical examiner/forensic pathologist could have reasonably concluded given the facts of this case." (Brief for Appellant at 39.) But even if Defendants were not qualified to offer their opinions on this score, their doing so does not suggest that they fabricated those opinions. Indeed, Dr. de Jong explained that she said that Kalla was probably, but not certainly, killed by an adult, and that all the literature supported her belief. And Dr. Castellani testified that it was clear to him that a significant amount of force was used to cause Kalla's injuries and that he was not familiar with any report where injuries of that magnitude had been caused by a child. [7] Plaintiff's expert, by contrast, concluded that Kalla's injuries could have been inflicted by *either* an adult *or* a child and that there was no scientific way to determine which—child or adult—caused the injuries. This contrary conclusion evinces nothing more than a professional disagreement over what conclusions can properly be drawn from the medical evidence; what the evidence does not do is support the assertion that Defendants fabricated evidence.

In sum, the record supports that Dr. de Jong attempted to conduct a thorough autopsy. "Whether [s]he succeeded is immaterial [to] establishing a Fourth Amendment violation." *Caminata*, 664 F. App'x at 501. Viewed in the light most favorable to Plaintiff, the record at best reveals that Defendants were negligent in their investigation, "and such a conclusion does not establish a constitutional violation." *Id.*; *see Ahlers v. Schebil*, 188 F.3d 365, 373–74 (6th Cir. 1999) ("At best, however, the investigation's lack of thoroughness might support an inference of negligence, but it does not demonstrate knowing or intentional behavior designed to violate [the plaintiff's] constitutional rights."); *see also Seigel v. City of Germantown*, 25 F.

---

[7] Dr. Schmidt maintains that he "never provided an opinion that Kalla's injury or death was caused by, or must have been caused by, an adult or an adult-sized person." (Brief for Appellee Schmidt at 8.)

16

App'x 249, 250 (6th Cir. 2001) ("The facts in this case supported at most a finding of incompetent or negligent investigation, which is insufficient to establish a constitutional violation."). Defendants are thus entitled to qualified immunity on Plaintiff's claims for fabrication of evidence and malicious prosecution.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment in favor of Defendants.